[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15737
_____

D.C. Docket No. 1:14-cv-01072-TWT

ACRYLICON USA, LLC,
a Delaware limited liability company,

Plaintiff-Appellee,

versus

SILIKAL GMBH,
a foreign corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(January 26, 2021)

Before JORDAN and TJOFLAT, Circuit Judges, and SCHLESINGER,* District
Judge.

TJOFLAT, Circuit Judge:

_____

* Honorable Harvey Erwin Schlesinger, United States District Judge for the Middle
District of Florida, sitting by designation.

This case involves the breach of an agreement between two parties who shared a trade secret, AcryliCon USA, LLC ("AC-USA"), and Silikal GmbH ("Silikal"). The trade secret consisted of the formula for 1061 SW, a flooring resin Silikal manufactured and sold (along with other flooring resins). The agreement provided that AC-USA and its affiliate, AcryliCon International, Ltd. ("AC-International"), would be Silikal's exclusive distributors of 1061 SW and that Silikal would not sell the resin without AcryliCon's[1] written permission.

According to AC-USA, Silikal breached the agreement by selling 1061 SW without its written permission, so it sued Silikal under common law for breach of contract ("Contract" claim) and under the Georgia Trade Secrets Act of 1990 ("GTSA")[2] for misappropriation of the shared trade secret ("Misappropriation" claim).[3] A jury awarded AC-USA damages of $1.5 million on each of the two claims, and the District Court awarded AC-USA $3 million in punitive damages on the Misappropriation claim. The District Court thereafter denied Silikal's post-

---

[1] Throughout this opinion, we will refer to the Plaintiff as "AC-USA" and to AcryliCon International, Ltd. as "AC-International." To refer to both entities, we will simply say "AcryliCon."

[2] O.C.G.A. § 10–1–760 *et seq.*

[3] AC-USA's Second Amended Complaint, the operative complaint here, contained seven claims, each in a separate count, as indicated *infra.* Only the claims for breach of contract (Count Seven) and misappropriation of trade secret (Count One) were adjudicated in the District Court's judgment.

verdict motion for judgment as a matter of law on the Misappropriation and Contract claims and entered a final judgment for AC-USA for $5,861,415.[4]

Silikal appeals. It argues first that the District Court erred in denying its motion to dismiss the case for lack of personal jurisdiction. It argues alternatively that the Court erred in denying its motion for judgment as a matter of law on the Misappropriation and Contract claims.[5] We reject Silikal's argument that the District Court lacked jurisdiction over its person, and therefore affirm the Court's denial of Silikal's motion to dismiss. We are persuaded, though, by Silikal's argument that AC-USA failed to prove its Misappropriation claim. We also agree that AC-USA failed to prove that it sustained cognizable damages on its Contract claim. We therefore reverse the District Court's judgment on the Misappropriation claim and vacate the damages awarded on the Contract claim. We also hold that AC-USA is entitled to nominal damages and attorney's fees on its Contract claim in a sum to be determined by the District Court on remand.

---

[4] The final judgment consists of $1.5 million in damages, $3 million in punitive damages, and $1,361,415 in attorney's fees.

[5] Silikal does not challenge the District Court's decision on summary judgment that it breached the parties' contract by selling 1061 SW without AC-USA's written consent. As a result of that decision, the Contract claim was tried to the jury on the issue of damages only.

4

I.

A.

At the center of this dispute is an industrial flooring resin called 1061 SW. A flooring resin is a liquid that settles into a solid floor when it is combined with other chemicals and spread over a surface. The 1061 SW resin is unique for two reasons: It forms a floor with roughly twice the compressive strength of other resins, and it is a valuable trade secret. The 1061 SW resin is used to make commercial floors in restaurants, manufacturing facilities, hospitals, schools, grocery stores, and the like.

Although the parties shared the formula for the purpose of their manufacturer-distributor relationship, AC-USA and Silikal each claim to own the 1061 SW formula, to the exclusion of the other. Silikal traces its ownership back to 1987, when it claims to have invented the formula. AC-USA, meanwhile, claims ownership by virtue of a 2010 Global Settlement Agreement ("GSA") entered into by the parties and their affiliates. The GSA resolved a lawsuit between AC-International and Silikal America—entities affiliated with but distinct from the parties before us today.

B.

The 1061 SW formula was invented in 1987. While Silikal claims to have invented the formula on its own, AC-USA insists that Silikal merely participated in

its invention, and that Bjorn Hegstad, a chemical engineer who founded AC-International, came up with the idea.  According to AC-USA, Hegstad and Silikal agreed[6] at the time of the formula's invention that the formula belonged to Hegstad and AC-International, and that Silikal possessed the formula for the sole purpose of manufacturing the 1061 SW resin for Hegstad and AC-International.

From 1987 to 1997, Hegstad sold 1061 SW in Norway under an agency agreement between Hegstad and Silikal.  In 1997, AC-International and Silikal executed an agency agreement establishing AC-International as the exclusive distributor of 1061 SW resin.[7]

In 2008, AC-USA was incorporated.  That same year, AC-USA entered into a licensing agreement with two affiliates of AC-International—Raliz AG and AcryliCon Distribution Est.—that gave AC-USA the right to import, market, and sell "AcryliCon Systems"[8] in the United States, including the 1061 SW resin.  AC-USA was not permitted to sell AcryliCon Systems outside of the United States without permission from AC-International.

---

[6] Hegstad testified to the existence of an oral and written agreement, but no written agreement was actually introduced.

[7] While the 1997 agency agreement is referenced in the record, the agreement itself is not part of the record.

[8] The phrase "AcryliCon Systems" refers to the industrial flooring products sold by AcryliCon, including the floors made from the 1061 SW resin.

Shortly after AC-USA was formed, disputes between AC-International and Silikal resulted in a lawsuit between the two parties.[9]  The lawsuit was resolved in 2010 when the parties entered into the GSA.  Although AC-USA was not a party to the lawsuit, it was a party to the GSA.[10]

The GSA created a contract that accomplished several objectives ("GSA Contract").  First, it terminated the 1997 agency relationship between AC-International and Silikal.  Second, it settled all present and future claims relating to the parties' business relationship, except for claims arising from the GSA Contract itself.  Third, Silikal promised that it would "preserve the secrecy" of the 1061 SW formula.  Fourth, Silikal promised that it would not sell the 1061 SW resin to anyone other than AcryliCon without AcryliCon's written consent.[11]  Fifth, Silikal

---

[9] AC-International filed the lawsuit against Silikal because Silikal had allegedly used pictures of AC-International's floors in its sales materials.

[10] The parties to the GSA are Silikal GmbH, Silikal USA, Inc., AcryliCon International, Ltd., AC-USA, LLC, Alpenstock Holding, Ltd., AcryliCon Distribution Est., and Bjorn Hegstad.

[11] AC-USA's Contract claim is based on Paragraph 5 of the GSA Contract, titled "Confidentiality and Use of 1061 SW."  Paragraph 5 provides in full:

Silikal represents and warrants that it has not disclosed the formula for 1061 SW resin or sold or distributed 1061 SW resin, directly or indirectly, to anyone other than AcryliCon during the pendency of the Silikal/AcryliCon relationship.  Silikal hereby covenants and agrees that it will preserve the secrecy of the formula for the 1061 SW resin.  Silikal will not disclose or use in any way, directly or indirectly, the 1061 SW resin or formula for the 1061 SW resin.  Silikal further covenants and agrees NOT to sell or distribute 1061 SW resin to anyone other than AcryliCon, or as expressly permitted in writing by AcryliCon.  Within 10 days of this Settlement Agreement, Silikal shall ship by DHL to Bjorn Hegstad . . . all laboratory records and other available documents regarding the formulation and development of the 1061 SW resin.

7

promised to ship "all laboratory records and other available documents regarding the formulation and development of the 1061 SW resin" to Bjorn Hegstad.  Finally, Silikal promised that it would "make no statements or representations . . . regarding the formula for 1061 SW," and all parties agreed not to make statements or representations "that Silikal Products and AcryliCon Systems are the same."

The GSA Contract also contains a forum-selection provision.  The provision states that disputes arising from activities in the United States shall be governed by "the laws of the United States and the State of Georgia," and that jurisdiction shall be exclusive in the Northern District of Georgia.  The parties also waived any objections to personal jurisdiction and to the location of venue in the Northern District of Georgia as to all disputes relating to the GSA Contract and arising from activities in the United States.  As to disputes arising outside of the United States, the GSA states that they shall be governed according to the laws of the place of the dispute.

## C.

AC-USA filed this lawsuit in 2014, claiming that Silikal breached the GSA Contract by manufacturing the 1061 SW resin, selling it on a global scale, and taking credit for AcryliCon Systems in its marketing.  AC-USA pled seven counts

8

in its complaint: misappropriation of trade secrets,[12] trademark infringement,[13] unfair competition,[14] state statutory trademark infringement and unfair competition,[15] common law trademark infringement and unfair competition,[16] deceptive trade practices,[17] and breach of contract.[18]

AC-USA filed its complaint in the United States District Court for the Northern District of Georgia.[19] Silikal responded with a motion to dismiss for lack of personal jurisdiction. According to Silikal, the Northern District of Georgia lacked jurisdiction over its person because Silikal had not sold 1061 SW in the United States to anyone other than AcryliCon. Accordingly, the GSA, which designates the Northern District of Georgia as the jurisdiction for claims arising from activities in the United States, did not apply. For the same reason, Silikal also asserted that the Court could not exercise jurisdiction under any applicable long-arm statute.

---

[12] O.C.G.A. § 10–1–760 *et seq.* (Count One).

[13] 15 U.S.C. § 1125 (Count Two).

[14] *Id.* §§ 1125–1126 (Count Three).

[15] O.C.G.A. § 23–2–55 (Count Four)

[16] (Count Five)

[17] *Id.* § 10–1–372(a)(1), (3), (5), (7), (8) (Count Six).

[18] Specifically, AC-USA argued that Silikal breached the GSA Contract (Count Seven).

[19] AC-USA amended its complaint twice, first as a matter of course and second with leave of the District Court in order to cure issues raised in Silikal's first motion to dismiss. We refer to the Second Amended Complaint as the "complaint."

AC-USA countered that the Northern District of Georgia could exercise personal jurisdiction over Silikal under the GSA because Silikal had sold 1061 SW resin in the United States under the label "R 61 H."  The parties produced competing affidavits on the issue.  AC-USA submitted an affidavit from Bernd Diel, who supervised operations at a Silikal factory in Germany.[20]  Diel stated that Silikal had sold 1061 SW to customers other than AcryliCon in the United States, and that when it did so, it labeled the 1061 SW as R 61 H.  Silikal produced an affidavit from Hubert Weimann, Silikal's Managing Director.[21]  According to Weimann, Silikal "never sold 1061 SW or any product containing the formulation 1061 SW to any customer in the United States, other than directly to Acrylicon."  Weimann acknowledged that Silikal had sold a resin called R 61 in the United States, but insisted that R 61 was distinct from 1061 SW.

The District Court denied Silikal's motion to dismiss, finding that it had personal jurisdiction over Silikal under the GSA.  According to the District Court, Diel's affidavit, together with Silikal's admission that it sold R 61 in the United

---

[20] Diel worked at Silikal for 25 years.  In 2009, he was moved to S&H Flooring Consult GmbH, which is fully controlled by Silikal.  He worked at S&H Flooring until January 2014.  He signed his affidavit in November 2014.

[21] Weimann has worked at Silikal since 1983.  He became the Managing Director in 2008.  He held that position in 2017 when he signed his affidavit for this case.

States, was a sufficient basis on which to exercise personal jurisdiction over Silikal.[22]

Following the District Court's ruling, Silikal answered AC-USA's complaint. The answer essentially denied liability on all claims.[23] Then, after limited discovery, AC-USA filed a motion for partial summary judgment on its Contract claim,[24] and for a permanent injunction barring Silikal from producing or selling 1061 SW. The Court granted AC-USA's motion and issued a permanent injunction[25] against Silikal, in no small part because "[p]revious counsel for

_____

[22] After the District Court denied Silikal's motion to dismiss, Silikal filed a motion for reconsideration arguing that the Court's ruling was based on the misimpression that R 61 and R 61 H were the same product. Since there was no evidence that R 61—as opposed to R 61 H—was 1061 SW, Silikal argued that there was no evidence that it sold 1061 SW to anyone other than AC-USA in the United States. Accordingly, Silikal concluded that the GSA did not supply a jurisdictional basis. The District Court denied Silikal's motion as untimely and without merit.

[23] Silikal's answer asserted eleven affirmative defenses, including failure of the complaint to state a claim for relief. None of these affirmative defenses are relevant here.

[24] AC-USA sought summary judgment solely on the issue of liability—whether Silikal breached the GSA Contract by selling 1061 SW resin without AC-USA's written consent.

[25] While the District Court called the injunction permanent, it was in fact preliminary. The injunction therefore dissolved when the Court entered its final judgment. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1093 (9th Cir. 2010); *United States ex rel. Berger v. Lawrence*, 848 F.2d 1502, 1512 (10th Cir. 1988). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). A preliminary injunction only becomes a permanent injunction when the district court includes a permanent injunction in its final judgment. *See Associated Builders & Contractors Fla. E. Coast Chapter v. Miami-Dade Cnty.*, 594 F.3d 1321, 1323–24 (11th Cir. 2010) (per curiam) ("Once an order of permanent injunction is entered, any preliminary injunction merges with it . . . .").

Here, the District Court entered the injunction against Silikal when it granted AC-USA's partial motion for summary judgment on the Contract claim. The Court's entry of summary judgment decided only the issue of liability, not damages. For that reason, it was not a final judgment, and the injunction was preliminary. *See Fort v. Roadway Express, Inc.*, 746 F.2d 744,

[Silikal] admitted . . . at a status conference before [the District Court] that 'there have been sales of [1061 SW] in violation of the global settlement agreement'" and that Silikal did not "dispute that there [had] been a breach of contract."

Silikal filed an interlocutory appeal challenging the permanent injunction.[26] Silikal argued that the District Court erred by (1) denying its motion to dismiss for lack of personal jurisdiction and (2) entering a permanent injunction. *AcryliCon USA, LLC v. Silikal GmbH & Co.* (*AcryliCon I*), 692 F. App'x 613, 615 (11th Cir. 2017) (per curiam).

We declined to exercise our pendent jurisdiction to consider Silikal's personal-jurisdiction argument on interlocutory appeal. *Id.* We did so because "the issue of personal jurisdiction is neither inextricably intertwined with nor necessary to ensure meaningful review of the district court's grant of a permanent injunction." *Id.* at 616.

Regarding AC-USA's case for the injunction, Silikal argued that AC-USA failed to comply with a GSA Contract provision requiring a nonbreaching party to

---

747 (11th Cir. 1984) ("A final judgment is generally recognized as being an order of the court which 'leaves nothing for the court to do but execute on the judgment.'") (citation omitted); *Warren Publishing, Inc., v. Microdos Data Corp.*, 115 F.3d 1509, 1511 n.1 (11th Cir. 1997) (en banc); *see also Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 742, 96 S. Ct. 1202, 1206 (1976). The Court did not include a permanent injunction in its final judgment, and the preliminary injunction therefore dissolved when the Court entered its final judgment. AC-USA has not filed a cross-appeal challenging the Court's failure to include a permanent injunction in its final judgment, so we will not address the issue on appeal.

[26] We had jurisdiction to review the injunction as an interlocutory order pursuant to 28 U.S.C. § 1292(a)(1).

take certain steps before filing suit. *Id.* Pursuant to the GSA Contract, a nonbreaching party must provide written notice to the breaching party and an opportunity to cure the breach within ten days; if it is not cured, the parties must attempt mediation within 30 days. *Id.* If both steps fail to cure the breach, the nonbreaching party may file suit. *Id.*

Silikal argued, and AC-USA did not dispute, that AC-USA failed to give written notice or provide a chance at mediation before it filed its initial complaint. *Id.* at 616–17. We nevertheless upheld the injunction because, after AC-USA filed its initial complaint, it satisfied these GSA Contract requirements. *Id.* at 617.

Before we issued our opinion in *AcryliCon I*, this case went to trial before a jury. AC-USA called three live witnesses: Jason Bye, director of sales and ten percent owner of AC-USA; Dawn Bye, director of operations and 84 percent owner of AC-USA; and Patrick Gannon, a damages expert. AC-USA presented the testimony of seven witnesses via videotaped depositions: Bjorn Hegstad; Bernd Diel; Hubert Weimann; Henning Simon, director of sales and exports of Silikal; Hermann Huber, production manager of Silikal; Bjoern Hundshammer, assistant production manager of Silikal; and Harald Schmidt, former managing director and part owner of Silikal. Finally, AC-USA presented the written deposition testimony of Bettina Waldecker, managing director of Silikal. The testimony of these witnesses established that Silikal sold 1061 SW in several foreign countries, but

none in AC-USA's licensed territory. Gannon, based on Silikal's business records, calculated the revenues and profits Silikal made from selling 1061 SW, including convoyed sales (that is, sales including both 1061 SW and other products).

After presenting the testimony of these witnesses, AC-USA rested its case and Silikal moved the District Court for judgment as a matter of law on all of AC-USA's claims.[27] Silikal noted AC-USA's failure to present any evidence that Silikal had sold 1061 SW in the United States, and argued that AC-USA had therefore failed to show that it suffered any compensable harm.

AC-USA responded by informing the Court that it was withdrawing five of its seven claims,[28] leaving only the Misappropriation claim and damages on the Contract claim.[29] The Court granted Silikal's motion as to the withdrawn claims

---

[27] Fed. R. Civ P. 50(a)(1).

[28] The five claims were asserted in Counts Two through Six of the complaint. AC-USA argued that its withdrawal of the five claims should be treated as a motion to amend its complaint (to delete the claims), and that Counts Two through Six should be dismissed without prejudice. The Court rejected AC-USA's argument and, as indicated in the following text, granted Silikal's motion for judgment as a matter of law on those five counts. The Court also entered judgment for Silikal on Count Seven, the Contract claim, to the extent that Count Seven sought attorney's fees under O.C.G.A. § 13–6–11. That section provides:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

O.C.G.A. § 13–6–11.

[29] These claims were asserted in Counts One and Seven of the complaint. Only the matter of damages remained to be litigated on the Count Seven claim because Silikal conceded that the Court's order granting AC-USA a permanent injunction based on its breach of the GSA Contract resolved all Count Seven issues except the matter of damages.

and denied it as to the Misappropriation and Contract claims, which were then sent to the jury.

The jury found for AC-USA, awarding $1.5 million on the Misappropriation claim and $1.5 million on the Contract claim. Post-verdict, AC-USA moved the District Court to award punitive damages on the Misappropriation claim.[30] Over Silikal's objection, the Court granted the motion and awarded AC-USA $3 million. Silikal challenged the jury's verdicts and the District Court's punitive damages decision by renewing its motion for judgment as a matter of law.[31] Silikal also moved the Court to grant a new trial.[32]

In its renewed motion, Silikal reiterated its earlier argument that the Court lacked personal jurisdiction. The Court rejected the argument on two grounds. First, Diel's trial testimony indicated that Silikal had distributed a sample of 1061

---

[30] O.C.G.A. § 10–1–763(b) gives the district court discretion to award "exemplary damages" for "willful and malicious misappropriation." The jury verdict included a specific finding that Silikal's conduct constituting misappropriation was "willful."

[31] Fed. R. Civ P. 50(b).

[32] Id.

SW in the United States.[33]  Second, Silikal had admitted that it breached the GSA

Contract, which harmed AC-USA in the United States.[34]

After it resolved the jurisdiction issue, the District Court denied Silikal's

motions for judgment as a matter of law and for a new trial.  The Court concluded

that the evidence was sufficient to establish that Silikal had misappropriated AC-

USA's trade secret and that AC-USA had suffered cognizable harm.

---

[33] The District Court drew on Diel's testimony, presented at trial via video:

Q. When did you first tell Mr. Hegstad or Mr. Fischer or anyone else associated with AcryliCon that you believed that Silikal had been using 1061 [SW] in its sales of R 61 H?

A. It was in February or March 2014.  And I didn't believe, but I knew that they did that.

Q. Do you have any knowledge that R 61 H was ever sold by Silikal to anyone in the United States?

A. At least as a sample to Sika.

Q. That's what I mean, whether – no matter what was in it, are you aware of any Silikal R 61 H ever being indirectly shipped to or used in the United States?

A. Yes.

Q. Okay.  What knowledge do you have on that basis – in that regard?

A. I know that Sika ordered R 61 H that was determined – or that was supposed to be shipped into the U.S. from there.

Q. I thought you just told me that the only – that the only knowledge you had that R 61 H had ever been sold to anyone in the United States was that Sika had been provided with a sample.

A. Yes, there were samples that officially went to Sika but that went – actually went to the USA.

[34] As we discussed above, prior counsel admitted that "there have been sales of the product in violation of the [GSA]" and that Silikal does not "dispute that there's been a breach of the [GSA]."

16

After the District Court disposed of Silikal's motions, AC-USA moved for attorney's fees, and the Court awarded $1,361,415. The Court then entered a final judgment of $5,861,415.

Silikal appealed the District Court's judgment. Among other things, Silikal argued that the Court's $1.5 million damages judgment was only for the Misappropriation claim and not for the Contract claim. AC-USA disagreed, arguing that the judgment awarded the same $1.5 million for both the Misappropriation and Contract claims. Finding the judgment ambiguous, we issued a limited remand while retaining jurisdiction, instructing the District Court to clarify its judgment. The District Court promptly entered a revised final judgment, which gave AC-USA $1.5 million on both the Misappropriation and Contract claims. We then ordered supplemental briefing on the Contract-claim award.

Silikal appeals the revised final judgment. We consider four issues. First, whether the District Court properly exercised personal jurisdiction over Silikal. Second, whether the District Court erred in denying Silikal's motion for judgment as a matter of law on the Misappropriation claim. Third, whether the District Court erred when it entered its revised final judgment awarding AC-USA $1.5 million in damages on the Contract claim. Fourth, whether AC-USA is entitled to attorney's fees. We address each issue in turn.

17

II.

Silikal argues that the District Court erred in denying its motion to dismiss for lack of personal jurisdiction. We hold that Silikal has waived its personal-jurisdiction challenge by appealing the District Court's pre-trial jurisdictional ruling instead of its final disposition. In other words, Silikal appealed the Court's denial of its motion to dismiss when it should have appealed the Court's denial of its post-verdict motion for judgment as a matter of law.

A.

We review a district court's exercise of personal jurisdiction *de novo* and its factual findings for clear error. *Nippon Credit Bank, Ltd. v. Matthews*, 291 F.3d 738, 746 (11th Cir. 2002) (per curiam).

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593 F.3d 1249,1257–58 (11th Cir. 2010) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)).

When a defendant challenges personal jurisdiction in a Rule 12(b)(2) motion to dismiss, the district court must hear and decide the issue "before trial unless the

court orders a deferral until trial." Fed. R. Civ. P. 12(i). Rule 12(i) affords the district court discretion on how to proceed at this stage. While the plaintiff bears the burden of establishing personal jurisdiction, the plaintiff's burden of proof varies according to how the district court chooses to proceed. *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009); *see also Forsythe v. Overmyer*, 576 F.2d 779, 781 (9th Cir. 1978) ("Upon a motion to dismiss for lack of personal jurisdiction, the burden varies according to the nature of the pre-trial proceedings in which the jurisdictional question is decided.").

No matter how the district court proceeds, the plaintiff must eventually—by the close of evidence—establish personal jurisdiction by a preponderance of the evidence. *General Elec. Credit Corp. v. Scott's Furniture Warehouse Showroom, Inc.*, 699 F. Supp. 907, 910 (N.D. Ga. 1988); *see also In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 778 (5th Cir. 2018); *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). The district court can impose the preponderance-of-the-evidence standard right away, during the pre-trial phase, by conducting an evidentiary hearing. If it holds a hearing, the court "adjudicate[s] the issue of whether the court has jurisdiction over the defendant's person" by "determin[ing] the credibility of the witness testimony, weigh[ing] the evidence, and find[ing] the relevant jurisdictional facts." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010). Because the

court is making factual determinations and reaching a final decision on jurisdiction, a preponderance-of-the-evidence standard applies. *E.g.*, *Resolution Trust Corp. v. Pharaon*, 915 F. Supp. 351, 358 (S.D. Fla. 1996); *Grayson*, 816 F.3d at 269; *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012); *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 676 (1st Cir. 1992).

Alternatively, the district court can wait to impose a preponderance-of-the-evidence standard until trial. If the court chooses this course, then it reviews the motion to dismiss under a prima facie standard. In such a case, the district court decides the motion to dismiss based solely on the complaint and affidavits. The plaintiff meets its burden if it presents enough evidence to withstand a motion for judgment as a matter of law. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). The court accepts as true all unchallenged facts in the plaintiff's complaint, and then considers all affidavit evidence proffered by the parties. To the extent that "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Diamond Crystal*, 593 F.3d at 1257. Whether the plaintiff satisfies the prima facie requirement is a purely legal question; the district court does not weigh evidence or make credibility determinations.

20

If the district court applies the prima facie standard and denies the motion to dismiss, "it is implicitly, if not explicitly, ordering 'that hearing and determination [of the motion to dismiss] be deferred until the trial.'" *Boit*, 967 F.2d at 676 (alteration in original) (quoting Fed. R. Civ. P. 12(d)).[35]  After trial, if the defendant still believes personal jurisdiction is lacking, it may invite the district court to revisit personal jurisdiction in light of the evidence produced at trial, at which time the court will impose a preponderance-of-the-evidence standard.

Personal jurisdiction is a waivable defect.  *Palmer v. Braun*, 376 F.3d 1254, 1259 (11th Cir. 2004) (per curiam).  A defendant who does not object to personal jurisdiction in a responsive pleading or a Rule 12 motion, or who raises personal jurisdiction for the first time on appeal, waives the defect.  *Id.*

B.

Silikal did not request, and the District Court did not conduct, an evidentiary hearing to decide the personal jurisdiction issue before trial.  Rather, based on AC-USA's complaint and supporting affidavits, as well as Silikal's affidavits, the

---

[35] The language quoted in *Boit* comes from an older version of Rule 12.  The rule was amended in 2007 for stylistic purposes only.  Fed. R. Civ. P. 12 advisory committee's note to 2007 amendment.  The current version reads:

> If a party so moves, any defense listed in Rule 12(b)(1)-(7)–whether made in a pleading or by motion–and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.

Fed. R. Civ. P. 12(i).

21

Court decided that AC-USA satisfied the prima facie standard for personal jurisdiction.

By denying Silikal's motion to dismiss, the District Court implicitly deferred the jurisdictional determination until trial. Post-trial, as part of its renewed motion for judgment as a matter of law, Silikal asked the District Court to revisit the personal jurisdiction issue in light of the evidence.[36] In so doing, Silikal subjected AC-USA to the heightened preponderance-of-the-evidence standard.

When the District Court revisited the issue post-trial, it offered two new grounds for finding personal jurisdiction. Both came to light during the trial and were not included in the Court's pre-trial order denying the motion to dismiss. The District Court's post-trial ruling was its final disposition of the personal jurisdiction issue. If the Court considered the record incomplete when it denied the motion to dismiss pre-trial, the record of the trial afforded it the opportunity to make a more informed jurisdictional ruling.

Silikal has waived its challenge to personal jurisdiction because it only appeals the District Court's pre-trial denial of its motion to dismiss, rather than the Court's post-trial disposition of the jurisdiction issue. In essence, Silikal asks us to

---

[36] Instead of raising the personal jurisdiction issue in its motion for judgment as a matter of law, Silikal should have raised it in a motion to revisit personal jurisdiction. For the purposes of this discussion, we treat Silikal's request as if it appeared where it belonged—in a motion to revisit.

review the motion-to-dismiss record to determine whether the District Court erred at that juncture, despite the fact that the Court, in its pre-trial order, deferred its final jurisdictional ruling until trial. Because Silikal makes no argument about the post-trial order, we do not review it.

Stated generally, we now hold that when a district court denies a motion to dismiss for lack of personal jurisdiction, and then revisits personal jurisdiction post-trial in light of the record as it exists at that time, the defendant must appeal the post-trial disposition in order to preserve the issue of personal jurisdiction on appeal.

III.

Silikal argues that the District Court erred in denying its motion for judgment as a matter of law on AC-USA's Misappropriation claim. We agree, and accordingly reverse the judgment.

We review the denial of a renewed motion for judgment as a matter of law *de novo*. *EEOC v. Exel, Inc.*, 884 F.3d 1326, 1329 (11th Cir. 2018). "Under Rule 50, a party's motion for judgment as a matter of law can be granted at the close of evidence or, if timely renewed, after the jury has returned its verdict, as long as there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007) (quotation marks omitted) (alteration adopted).

23

To prove a claim for misappropriation of trade secrets under the GTSA, a plaintiff must show that "(1) it had a trade secret and (2) the opposing party misappropriated the trade secret." *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290–91 (11th Cir. 2003).

AC-USA claims that Silikal's manufacture and sale of the 1061 SW resin without its prior written consent constituted misappropriation under the GTSA. The parties agree that the 1061 SW formula is a trade secret, but disagree as to whether the evidence was sufficient for the jury to decide that the trade secret was AC-USA's and that Silikal misappropriated it. We find it unnecessary to decide whether AC-USA had the trade secret, because the evidence that Silikal misappropriated it is insufficient as a matter of law.

Misappropriation, in the sense relevant here, means:

Disclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was . . . *[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.*

O.C.G.A. § 10–1–761(2)(B) (emphasis added).[37]

---

[37] O.C.G.A. § 10–1–761(2) reads in full:

(2) "Misappropriation" means:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

It is undisputed that Silikal used the formula without AC-USA's consent.

Thus, assuming arguendo that AC-USA had the trade secret, AC-USA had to show

that (1) Silikal owed AC-USA a duty to maintain the formula's secrecy or limit its

use, and (2) that this duty arose *at the time Silikal acquired the formula*.  AC-USA

failed to make this showing.

At most, the evidence showed that Silikal and Hegstad developed the 1061

SW formula together in 1987.  Furthermore—if we are generous to AC-USA—it

showed that Silikal agreed with Hegstad that the formula would be the property of

Hegstad and AC-International.[38]  AC-USA could not have been a party to this

---

(i) Used improper means to acquire knowledge of a trade secret;

(ii) At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) Derived from or through a person who had utilized improper means to acquire it;

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

[38] We note two significant problems with this factual theory.  First, it is in tension with the terms of the GSA Contract.  If Hegstad were the developer and owner of the formula, one would expect him to possess it.  Yet the GSA required Silikal to ship the 1061 SW formula to Hegstad, suggesting Hegstad did not already possess it.  AC-USA has not explained why this inconsistency does not rebut its factual theory.  Second, the theory that the formula belonged to AcryliCon rather than Silikal is in tension with the nature of the parties' manufacturer-distributor relationship.  A "distributorship" is defined as "[a] company that has an arrangement to sell *the products of another company*."  *Distributorship*, Black's Law Dictionary (11th ed. 2019) (emphasis added).  AcryliCon was Silikal's exclusive distributor of 1061 SW resin, and the GSA did nothing to alter the essence of this relationship.  Accordingly, the natural expectation would be that Silikal owned the formula, since it was the entity that actually manufactured the resin.  If

agreement because AC-USA did not exist at the time the formula was developed.[39]

At most, therefore, the evidence showed that Silikal owed AC-International a duty

at the time Silikal acquired the formula.  Silikal owed no such duty to AC-USA.

It was not until the parties entered the GSA Contract in 2010 that Silikal

incurred any duty to AC-USA with respect to the formula.  Under the GSA

Contract, Silikal agreed to "preserve the secrecy of the formula for the 1061 SW

resin."  It also promised it would not "disclose or use in any way . . . the 1061 SW

resin or the formula for the 1061 SW resin" and that it would not "sell or distribute

1061 SW resin to anyone other than AcryliCon" without AcryliCon's permission.

To prove misappropriation, however, AC-USA had to show that Silikal owed these

duties to AC-USA *at the time Silikal acquired* the formula.  Proof that these duties

arose by contract thirteen years later was insufficient as a matter of law.  Because

AC-USA did not exist at the time 1061 SW was developed and Silikal acquired it,

it was factually impossible for AC-USA to prove what the GTSA requires.

Silikal's violation of the duties created by the GSA Contract gave AC-USA a claim

for breach of contract, not for misappropriation of a trade secret.

---

it were otherwise, AC-USA, by definition, would not be Silikal's distributor.  Nonetheless, for
the purpose of reviewing the District Court's denial of Silikal's motion for judgment as a matter
of law, we will overlook these problems.

[39] AC-USA did not come into existence until 2008.

In sum, the District Court erred in denying Silikal's motion for judgment as a matter of law on AC-USA's Misappropriation claim. In addition to entering judgment for Silikal on the Misappropriation claim, the Court should have struck the $3 million punitive damages award that was based on that claim. The award is therefore vacated.

IV.

We now address whether the $1.5 million damages award can be sustained on the basis of AC-USA's Contract claim. We hold that it cannot, and we therefore vacate the award.

The jury returned a verdict for AC-USA awarding $1.5 million on the Misappropriation claim and $1.5 million on the Contract claim. The District Court then ordered the clerk to enter judgment for AC-USA in the sum of $4.5 million ($1.5 million in compensatory damages and $3 million in punitive damages). Finding the judgment ambiguous, we issued a limited remand to the District Court for clarification about whether the judgment was based on the Misappropriation claim only, or whether it was also based on the Contract claim.[40] In response, the Court issued a revised final judgment stating that each claim was an independent ground for the award.

---

[40] The judgment stated merely that "judgment is entered . . . in favor of the Plaintiff and against the Defendant in the sum of $4.5 million."

27

We then allowed the parties to submit supplemental briefing regarding the Court's revised judgment. Silikal argues in its supplemental brief that the District Court erred in entering the revised judgment for AC-USA on its Contract claim because AC-USA failed to prove actual damages from Silikal's breach. We agree, and hold that AC-USA is instead entitled only to an award of nominal damages.

## A.

To explain the District Court's error, we must first distinguish between the remedies of restitution and actual damages. The remedy of restitution applies when a plaintiff confers a benefit on a defendant, and the defendant would be unjustly enriched at the expense of the plaintiff if it were allowed to keep the benefit. Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (Am. L. Inst. 2011). The remedy typically compels the defendant to "restore the benefit in question or its traceable product, or else pay money in the amount necessary to eliminate unjust enrichment." *Id.* Thus, the essence of the remedy is usually "the reversal of a transfer." *Id.* Sometimes, however, "the remedy for unjust enrichment gives the plaintiff something . . . that the plaintiff did not previously possess." *Id.* This species of restitution is called disgorgement, and it generally allows a plaintiff to recover the defendant's "wrongful gain," even if that gain exceeds the plaintiff's provable loss. *Id.* § 3 cmt. a.

28

Actual damages for breach of contract, by contrast, "are given as compensation for *the injury sustained* as a result of the breach of a contract." O.C.G.A. § 13–6–1 (emphasis added).  The fundamental difference between restitution and actual damages, therefore, is that the former is measured by the defendant's gain, while the latter is measured by the plaintiff's loss.  Dan B. Dobbs, *Law of Remedies* § 4.1(1), at 555 (2d ed. 1993).

A plaintiff who proves misappropriation of a trade secret under O.C.G.A. § 10–1–763 may recover money for both unjust enrichment and actual damages. Section 10–1–763 provides:

> Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

Accordingly, the District Court instructed the jury that, if it found that Silikal misappropriated AC-USA's trade secret, it could award AC-USA money for actual loss and/or for Silikal's unjust enrichment.  The jury instruction tracked the language of § 10–1–763 essentially verbatim.  The instruction did not define unjust enrichment, but merely stated that "[u]njust enrichment occurs if Silikal receives a benefit to which it is not entitled."

The jury instruction regarding damages for breach of contract, by contrast, said nothing of unjust enrichment.  Instead, the Court instructed the jury that:

> Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from the breach and such as

29

the parties contemplated when the contract was made as the probable result of the breach.

In every case of breach of contract, the party not breaching it has a right to damages. But if there has been no actual damage, the Plaintiff can recover nominal damages.

Remote or consequential damages are not allowed whenever they cannot be traced solely to the breach of the contract unless they may be computed exactly such as the revenues that are the immediate fruit of the contract and are independent of any collateral enterprises entered into in contemplation of the contract.

Thus, to obtain a money judgment on its Misappropriation claim, AC-USA could prove either that it suffered actual damages from Silikal's conduct, or that Silikal was unjustly enriched at AC-USA's expense.  On its Contract claim, by contrast, AC-USA could obtain a money judgment only by proving actual damages of the sort that "the parties contemplated when the contract was made."  If it failed to prove this, then AC-USA could only obtain nominal damages.

## B.

AC-USA failed as a matter of law to prove that it suffered actual damages from Silikal's breach.

Actual damages under Georgia law may be direct or consequential.  Direct damages "arise naturally and according to the usual course of things from [the] breach."  *Denny v. Nutt*, 375 S.E.2d 878, 879 (Ga. App. 1988) (quoting *Quigley v. Jones*, 334 S.E.2d 664, 665 (Ga. 1985)).  Consequential damages, by contrast, arise "as the probable result of [the] breach."  *Id.*  The key distinction between direct

damages and consequential damages is that the former compensate for the value of the promised performance, while the latter compensate for additional losses incurred as a result of the breach. *See Imaging Systems Int'l., Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124, 127 (Ga. Ct. App. 1997) (noting that consequential damages "may include profits which might accrue collaterally as a result of the contract's performance," while direct damages "may include profits necessarily inherent in the contract") (quotation marks omitted).

On appeal, AC-USA does not argue that it suffered direct damages from Silikal's breach. Rather, AC-USA argues that, by selling the 1061 SW formula in violation of the GSA, Silikal made profits that would have been AC-USA's had there been no breach. Alternatively, AC-USA argues that Silikal's breach reduced the value of 1061 SW, and that AC-USA is entitled to damages equal to the formula's reduced value. We hold that AC-USA failed as a matter of law to prove these consequential damages.[41]

_____

[41] We also note that AC-USA's damages theory on appeal is in conflict with its theory at trial. AC-USA's theory at trial was based chiefly on restitution. Patrick Gannon, AC-USA's damages expert, calculated damages based on Silikal's revenues. Jason Bye, when asked what damages AC-USA was requesting, answered that the damages were from Silikal "selling our product as their own and profiting from it." When asked why AC-USA was entitled to Silikal's profits, he stated: "I just don't think it's fair that they sell our product as their own and make money off that." Dawn Bye's testimony was substantially the same. Finally, at closing argument, AC-USA's counsel urged the jury to award AC-USA "the amount of money that Silikal made from breaching the agreement and misappropriating [AC-USA]'s trade secrets."

AC-USA also opposed Silikal's post-verdict motion for judgment as a matter of law—which argued that AC-USA failed to prove actual damages—by emphasizing its unjust enrichment theory. AC-USA responded that "Silikal's focus on the alleged lack of damage to

A plaintiff may not recover consequential damages for breach unless such damages are within the contemplation of the parties at the time the contract was made, are "capable of exact computation," and "are independent of any collateral enterprise entered into in contemplation of the contract." O.C.G.A. § 13–6–8.

Lost profits that are not part of the benefit of the bargain may be recovered as consequential damages. *Imaging Systems Int'l.*, 490 S.E.2d at 127. However, "[t]he profits of a commercial business are dependent on so many hazards and chances, that unless the anticipated profits are capable of ascertainment, and the loss of them traceable directly to the defendant's wrongful act, they are too speculative to afford a basis for the computation of damages." *Johnson Cnty. School Dist. v. Greater Savannah Lawn Care*, 629 S.E.2d 271, 273–74 (Ga. Ct. App. 2006) (citation omitted). Accordingly, a plaintiff seeking lost profits must provide "information or data sufficient to enable [the trier of fact] to estimate the amount of the loss with reasonable certainty." *Bearoff v. Craton*, 830 S.E.2d 362, 373 (Ga. Ct. App. 2019) (alteration in original) (quoting *Pounds v. Hosp. Auth. Of Gwinnett Cnty.*, 399 S.E.2d 92, 94 (Ga. Ct. App. 1990)). "This 'information or data' must include evidence showing that the business claiming lost profits had 'a

---

[AC-USA] all but ignores the unjust enrichment theory on which the damages were based." AC-USA insisted that evidence regarding its own lost profits, or lack thereof, was irrelevant. By relying on unjust enrichment in this way, AC-USA effectively abandoned any argument that it suffered actual damages from Silikal's breach.

32

proven track record of profitability.'" *Id.* (quoting *EZ Green Associates v. Georgia-Pacific Corp.*, 770 S.E.2d 273, 277 (Ga. Ct. App. 2015)). "The plaintiff must also show the expected profit for the relevant time period" including "the business'[s] projected revenues, as well as its projected expenses, for that time frame." *Id.* (quoting *Johnson Cnty.*, 629 S.E.2d at 274).

Thus, in *Bearoff*, the Georgia Court of Appeals held that the plaintiffs could not recover lost profits for the defendants' breach of a non-compete agreement because the only evidence of plaintiffs' loss was defendants' gross profits earned from the breach. *Id.* According to the Court, while the amount a defendant gained from breaching a contract "may be probative of the plaintiff's loss," it is not dispositive. *Id.* at 372. Because plaintiffs failed to present evidence of "a track record of profitability," or any "figures showing the store's anticipated revenues and expenses" for the relevant time period, the Court concluded that the plaintiffs' lost profits could not be calculated with reasonable certainty. *Id.* at 373.

The evidence AC-USA introduced at trial was likewise insufficient to establish lost profits. Jason Bye testified that Silikal's extraterritorial sales of 1061 SW hurt AC-USA's reputation as "the sole provider of the 1061 SW." Dawn Bye similarly testified that Silikal's use of 1061 SW injured AC-USA. When asked exactly how AC-USA had been injured, Dawn Bye responded that AC-USA was

33

"supposed to be the sole provider and sole source of 1061 SW," and that Silikal's

profits from 1061 SW were therefore owed to AC-USA as damages.

The foregoing testimony amounted to nothing more than an assumption that

Silikal's profits would have been AC-USA's but for Silikal's breach.  AC-USA

failed to introduce any evidence of projected profits, revenues, or expenses.  Nor

did AC-USA produce evidence of a "proven track record of profitability."  AC-

USA also did not point to any customers that it would have sold to if not for

Silikal's breach.  The evidence was insufficient to allow the jury to conclude with a

reasonable degree of certainty that, if not for the breach, AC-USA would have

made the 1061 SW sales that Silikal did.  Therefore, AC-USA failed as a matter of

law to prove lost profits.

AC-USA argues in the alternative that we should uphold the damages

judgment as a measure of 1061 SW's lost value.  In support of this lost-value

measure of damages, AC-USA cites *Fluorine on Call, Ltd. v. Fluorogas Ltd.*, 380

F.3d 849 (5th Cir. 2004).  As an initial matter, we note that the Fifth Circuit in

*Fluorine* merely discussed this theory of recovery without deciding whether it

applied under Texas law.  *Fluorine*, 380 F.3d at 860.  The Fifth Circuit noted that

the theory applies when a defendant's breach reduces the value of an asset owned

by the plaintiff.  *Id.*  In this situation, the plaintiff can recovery consequential

damages equal to the asset's decreased value.  *Id.*  To do so, however, the plaintiff

34

must introduce evidence of the "market value of the asset at the time of breach." *Id.* (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000)). "[I]n the absence of a standardized market or exchange," the Court noted that a plaintiff may prove market value through expert opinion or "evidence of sales of comparable assets." *Id.* (quoting *Schonfeld*, 218 F.3d at 178). Ultimately, the Court found that the plaintiff had failed to make the required showing because the record contained no evidence of the asset's market value. *Id.* at 861.

Even assuming Georgia law recognizes lost-value damages, we find the evidence legally insufficient under this theory, as well. AC-USA claims that the value of the 1061 SW formula in its hands was diminished because of Silikal's breach. Jason and Dawn Bye said as much at trial. However, AC-USA presented no evidence of 1061 SW's market value before or after the breach. Therefore, there was no legally sufficient basis to award lost-value damages.

## C.

As an alternative to its actual-damages theory, AC-USA urges us to uphold the Contract damages judgment on a theory of disgorgement. We decline to do so for two reasons. First, disgorgement is not an available remedy for breach of contract under Georgia law. Second, even supposing disgorgement were available for breach, the jury was not instructed that it could award this remedy. We would

35

therefore run afoul of the Seventh Amendment if we upheld the award on this

basis.

1.

AC-USA argues that disgorgement is available for Silikal's breach because

"Silikal's conduct . . . was in the nature of theft," and disgorgement is an

appropriate remedy for such intentional misconduct.  In support of its argument,

AC-USA cites the Restatement (Third) of Restitution and Unjust Enrichment,

which states: "If a deliberate breach of contract results in profit to the defaulting

promisor and the available damage remedy affords inadequate protection to the

promisee's contractual entitlement, the promisee has a claim to restitution of the

profit realized by the promisor as a result of the breach."  Restatement (Third) of

Restitution and Unjust Enrichment § 39(1).  The Restatement's comments make

clear that § 39 describes a disgorgement remedy—meaning that it permits a

plaintiff to "recover the defendant's profits from breach, even if they exceed the

provable loss to the [plaintiff] from the defendant's defaulted performance."  *Id.*

cmt. a.  AC-USA points to no authority suggesting that the Restatement approach

applies in Georgia, however.[42]

---

[42] AC-USA cites *Kansas v. Nebraska*, 574 U.S. 445, 135 S. Ct. 1042 (2015), in support of its argument that disgorgement is a remedy for breach of contract.  In that case, the Supreme Court enforced a remedy crafted by a special master that included partial disgorgement.  *Id.* at 448–49, 135 S. Ct. at 1049.  However, the Court noted that its equitable powers were expanded beyond what they would be in an ordinary suit between private parties because (1) the Court was

On the contrary, Georgia's statutory remedies for breach do not include anything resembling disgorgement, and AC-USA has not identified any authority suggesting that disgorgement is available as a matter of Georgia common law.[43] On the contrary, a review of Georgia case law strongly suggests that the remedy is only available for breaches of fiduciary duty. *See, e.g.*, *Bearoff*, 830 S.E.2d at 372 (upholding trial court's refusal to award disgorgement for breach of non-compete agreement because "Plaintiffs had not asserted a breach of fiduciary duty claim"); *McMillian v. McMillian*, 713 S.E.2d 920, 922–23 (Ga. Ct. App. 2011) (discussing Georgia Court of Appeals decisions "suggest[ing] that disgorgement of ill-gotten revenues or profits may be an appropriate remedy for a breach of fiduciary duty in some cases," but refusing to decide whether such a remedy is available for breaches in a partnership arrangement).

Since disgorgement is not among Georgia's statutory contract remedies, and there is no indication that it is available as a matter of common law, we presume

---

exercising its original jurisdiction to hear suits between states; (2) the case involved a dispute over water rights; and (3) the case involved a compact that had been given congressional approval and thereby attained the status of federal law. *Id.* at 453–56, 135 S. Ct. at 1051–53. For those reasons, the case has no bearing on an ordinary contract dispute between private parties.

[43] The only case interpreting Georgia law that AC-USA cites is *Direct Response Prods., Inc. v. Thomas*, No. 1:13-CV-1526-WSD, 2013 WL 5890473 (N.D. Ga. Nov. 1, 2013). In *Direct Response*, the District Court noted in dicta that an employer may receive an employee's unjust gain as a remedy for the employee's unlawful use of employer information. *Id.* at *4. This statement does not support AC-USA's broad argument that disgorgement is an appropriate remedy for intentional breaches of contract.

that the remedy is precluded by the traditional contract-law principle that damages should put the injured party in the position he would be in had the contract been performed.[44]  *See Lastinger v. City of Adel*, 26 S.E.2d 158, 159 (Ga. Ct. App. 1943); *see also* E. Allan Farnsworth, *Your Loss or My Gain? The Dilemma of the Disgorgement Principle in Breach of Contract*, 94 Yale L.J. 1339, 1341 (1985) ("[I]t is a principle of the law of contracts that damages for breach should be based on the injured party's lost expectation.").  Indeed, The Restatement itself notes that the "usual presumptions of contract law" limit recovery to the plaintiff's provable damages, and that the disgorgement remedy is therefore "anomalous on its face" as a remedy for breach.  Restatement (Third) of Restitution and Unjust Enrichment § 39 cmt. a.  Therefore, the $1.5 million judgment cannot stand on a disgorgement theory.

---

[44] In line with this principle, we note that while Georgia law enforces provisions for liquidated damages, O.C.G.A. § 13–6–7, it only does so to the extent such provisions are not penal in nature, *Broadcast Corp. of Ga. v. Subscription Television of Greater Atlanta*, 338 S.E.2d 775, 776–77 (Ga. Ct. App. 1985).  A provision for liquidated damages will be treated as an unenforceable penalty unless (1) the injury caused by the breach is difficult or impossible to accurately estimate; (2) the parties intended to provide for damages rather than a penalty; and (3) the stipulated sum is a reasonable pre-estimate of the probable loss resulting from the breach. *Southeastern Land Fund v. Real Estate World*, 227 S.E.2d 340, 343 (Ga. 1976).  "Where a designated sum is inserted into a contract for the purpose of deterring one or both of the parties from breaching it, it is penalty." *Broadcast Corp. of Ga.*, 338 S.E.2d at 777 (quoting *Florence Wagon Works v. Salmon*, 68 S.E. 866, 866 (Ga. Ct. App. 1910)).

The fundamental contract-law principle that a remedy for breach should be based on the loss suffered by the non-breaching party, therefore, is strong enough even to overcome the contracting parties' contrary intent.  The principle should apply with even more force here, where there is no indication that the parties contemplated a breach remedy without connection to the non-breaching party's actual damages.

2.

Even supposing disgorgement were an available contract remedy, it would run afoul of the Seventh Amendment to uphold the award on a basis that was not submitted to the jury.

The Seventh Amendment declares: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII.  The Supreme Court has "consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41, 109 S. Ct. 2782 (1989) (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447, 7 L. Ed. 732 (1830)).  Under the test articulated in *Granfinanciera*, the Seventh Amendment applies if both the cause of action and the remedy sought are legal, as opposed to equitable in nature.  *See id.* at 42, 109 S. Ct. at 2790.  Where the Seventh Amendment applies, "issues that are proper for the jury must be submitted to it to preserve the right to a jury's resolution of the ultimate dispute."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 718, 119 S. Ct. 1624 (1999) (quotation marks omitted).

39

The Seventh Amendment applies here because breach of contract is a traditional action at law, and a money judgment, even if based on restitution, is generally a legal remedy.[45]  *See Teamsters v. Terry*, 494 U.S. 558, 570, 110 S. Ct. 1339 (1990) ("[A]n action for money damages was the traditional form of relief offered in the courts of law.") (quotation marks omitted).

AC-USA asks us to uphold the $1.5 million award on a basis that the jury could not have considered.  With respect to the Contract claim, the jury was not instructed to decide whether AC-USA was entitled to Silikal's profits as disgorgement; rather, it was instructed only to consider whether AC-USA was entitled to actual damages.  If we accepted AC-USA's argument, we would effectively be swapping out the jury's actual-damages award for a restitution award.  To be sure, the number would be kept the same, but the nature of the relief

---

[45] Restitution may be a remedy at law or equity, depending on "the basis for [the plaintiff's] claim and the nature of the underlying remedies sought."  *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212, 122 S. Ct. 708 (2002) (alteration in original) (citation omitted); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 4(1).  A restitution remedy in the form of "a judgment imposing a merely personal liability upon the defendant to pay a sum of money" is generally a remedy at law.  *Knudson*, 534 U.S. at 213, 122 S. Ct. at 714; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 4 cmt. d.  By contrast, where a plaintiff seeks restitution of property "identified as belonging in good conscience to the plaintiff" and which can "clearly be traced to particular funds or property in the defendant's possession," the remedy is in equity.  *Knudson*, 534 U.S. at 213, 122 S. Ct. at 714; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 4 cmt. d; Dobbs, *supra* § 4.1(1), at 556 ("Restitution claims for money are usually claims 'at law.'").

The judgment here directed Silikal to pay AC-USA $1.5 million—the value of Silikal's wrongfully-earned profits—not to return to AC-USA any particular property or funds.  Therefore, the remedy is legal as opposed to equitable.

would be entirely different.  This would run afoul of the Seventh Amendment's requirement that "legal rights [are] to be ascertained and determined" by a jury. *Granfinanciera*, 492 U.S. at 41, 109 S. Ct. at 2790.

## D.

If a plaintiff proves a breach of contract but fails to prove actual damages, the plaintiff "may recover nominal damages sufficient to cover the costs of bringing the action."  O.C.G.A. § 13–6–6.

AC-USA established on summary judgment that Silikal breached the GSA. As already discussed, however, AC-USA failed to prove that it suffered actual damages as a result of Silikal's breach.  Therefore, AC-USA is entitled to an award of nominal damages "sufficient to cover the costs of bringing the action." O.C.G.A. § 13–6–6.

In sum, AC-USA failed as a matter of law to prove actual damages, and the $1.5 million award cannot be upheld on any other basis.  The District Court therefore erred in awarding AC-USA damages for breach in its revised final judgment.  We accordingly vacate the award and remand for determination of the sum of nominal damages to which AC-USA is entitled.

## V.

Finally, we address whether AC-USA is entitled to attorney's fees on its Contract claim notwithstanding that it failed to prove actual damages.  We hold

41

that it is entitled to attorney's fees, and we remand to the District Court for determination of an appropriate sum.

Georgia law permits recovery of attorney's fees "where authorized by some statutory provision or by contract." *Smith v. Baptiste*, 694 S.E.2d 83, 87 (Ga. 2010) (citation omitted).

The District Court awarded AC-USA $1,361,415 in attorney's fees on the Misappropriation and Contract claims, finding that fees were authorized by both O.C.G.A. § 10–1–764 and the GSA. Section 10–1–764 permits the court to award attorney's fees to the prevailing party where "willful and malicious misappropriation exists." Because we hold that AC-USA failed to prove its Misappropriation claim as a matter of law, it follows that AC-USA is not entitled to attorney's fees for that claim under § 10–1–764. However, AC-USA may still recover attorney's fees under the GSA as long as it can be considered a "prevailing party" within the meaning of the GSA's fee-shifting provision. That provision states:

> If legal proceedings are commenced in connection with this Settlement Agreement, the Settling Party or Parties that do not prevail in such legal proceedings shall pay the reasonable attorneys' fees and other costs and expenses, including investigation costs, *incurred by the prevailing party* in such legal proceedings.

(emphasis added).

To qualify as a prevailing party under a standard contractual fee-shifting provision, the Georgia Supreme Court has held that a party must obtain "actual relief on the merits [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in any way that directly benefits the plaintiff." *Magnetic Resonance Plus, Inc. v. Imaging Systems Int'l.*, 543 S.E.2d 32, 36 (Ga. 2001) (citation omitted).  An award of nominal damages is sufficient to make the plaintiff a prevailing party.  *King v. Brock*, 646 S.E.2d 206, 207 (Ga. 2007).

Because we hold that AC-USA is entitled to nominal damages on its Contract claim, AC-USA may also recover attorney's fees as a prevailing party under the GSA.  Accordingly, we vacate the $1,361,415 attorney's fees award and remand to the District Court for determination of the sum of fees to which AC-USA is entitled.

## VI.

For the foregoing reasons, we reverse the District Court's decision denying Silikal's motion for judgment as a matter of law on AC-USA's Misappropriation claim; vacate the $3 million punitive damages award, $1.5 million damages award, and $1,361,415 attorney's fees award; and remand to the District Court for a determination of the sum of nominal damages and attorney's fees to which AC-USA is entitled.

43

**VACATED AND REMANDED WITH INSTRUCTIONS.**