[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10126

_____

NORTH AMERICAN SUGAR INDUSTRIES, INC.,

Plaintiff-Appellant,

*versus*

XINJIANG GOLDWIND SCIENCE
& TECHNOLOGY CO., LTD.,
GOLDWIND INTERNATIONAL
HOLDINGS (HK) LTD.,
DSV AIR & SEA INC.,
BBC CHARTERING USA, LLC,
BBC CHARTERING SINGAPORE PTE LTD.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-22471-DPG

_____

Before WILSON, LUCK, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

North American Sugar Industries, Inc. ("North American Sugar")[1], sued five defendants under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(a)(1)(A), alleging that the defendants unlawfully "traffic[ked]" North American Sugar's property, which was stolen by the Cuban government. Three of the five defendants are corporations from East Asia: Xinjiang Goldwind Science & Technology Co., Ltd. ("Goldwind"), Goldwind International Holdings (HK) Ltd. ("Goldwind International"), and BBC Chartering Singapore Pte Ltd. ("BBC Singapore"). The remaining two defendants are DSV Air & Sea, Inc. ("DSV")—a Delaware corporation with its principal place of business in New Jersey—and BBC Chartering USA, LLC ("BBC USA")—a Texas corporation with its principal place of business in Texas.

Although none of the five defendants are from Florida, North American Sugar initiated this action in the U.S. District

_____

[1] North American Sugar is a New Jersey corporation with its principal place of business in New York.

23-10126                 Opinion of the Court                 3

Court for the Southern District of Florida. Allegedly, the defendants participated in a conspiracy that involved Helms-Burton trafficking from China, through Miami, Florida, and then to Puerto Carupano, Cuba. The defendants moved to dismiss for lack of personal jurisdiction. A magistrate judge agreed and recommended dismissal. North American Sugar objected, but the district court adopted the magistrate judge's recommendation. This is North American Sugar's appeal.

After careful review, and with the benefit of oral argument, we vacate the district court's order and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND

### A.  The Helms-Burton Act

In January 1959, Fidel Castro and the 26th of July Movement seized control of the Cuban government. *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1270 (11th Cir. 2022). During the years that followed, Castro "confiscated the property of" "millions of his own citizens," "thousands" of U.S. nationals, and "thousands more" Cubans who fled to the United States. 22 U.S.C. § 6081(3)(B). In 1996, Congress enacted the Helms-Burton Act, 22 U.S.C. §§ 6021 et seq., "to provide a means of compensation for some of the losses suffered as a result of the Castro regime's actions." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 919 (11th Cir. 2023). For "many" Cuban Americans, Title III of the Act is their "only remedy available" to redress the expropriation of their property by the Castro regime. *Id.* at 932 (Jordan, J., concurring).

One of the primary goals of the Helms-Burton Act is to "deter trafficking in wrongfully confiscated property;" specifically, the property of "United States nationals who were the victims of these confiscations." 22 U.S.C. § 6081(11). To achieve its goal of deterrence, the Helms-Burton Act places liability on private actors that participate in trafficking property stolen by the Cuban government. Section 6082(a)(1)(A) provides, in relevant part:

> [A]ny person that . . . *traffics* in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages in an amount equal to the sum of—
>
> (i) the amount which is the greater of—
>
>> (I) the amount, if any, certified to the claimant by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949, plus interest;
>>
>> (II) the amount determined under section 6083(a)(2) of this title, plus interest; or
>>
>> (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater; and
>
> (ii) court costs and reasonable attorneys' fees.

23-10126                Opinion of the Court                5

22 U.S.C. § 6082(a)(1)(A) (emphasis added).  Section 6082(a)(3) also provides for treble damages in some cases.

The Act broadly defines "traffics" for purposes of § 6082(a)(1)(A):

> [A] person "traffics" in confiscated property if that person knowingly and intentionally—
>
> > (i) sells . . . or . . . *uses*, or otherwise acquires or holds an interest in confiscated property,
> >
> > (ii) engages in a commercial activity *using or otherwise benefiting from* confiscated property, or
> >
> > (iii) *causes*, *directs*, *participates in*, or *profits from*, trafficking (as described in clause (i) or (ii)) *by another person*, or otherwise engages in trafficking (as described in clause (i) or (ii)) *through another person*,
>
> without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A) (emphasis added).  In light of this broad definition, an actor can trigger liability simply by knowingly and intentionally "caus[ing], direct[ing], participat[ing] in, or profit[ing] from" "another" person's "use[]" of property that was confiscated by the Cuban government.  *Id.* §§ 6023(13)(A), 6082(a)(1)(A).

Although the Helms-Burton Act was originally enacted in 1996, the Act's private cause of action "remained dormant for 23 years."  *Garcia-Bengochea*, 57 F.4th at 919.  "[T]hrough three different administrations," "the right to bring an action under Title III

6                  Opinion of the Court                23-10126

was suspended by Presidential decree." *Id.* at 919–20 (citing 22 U.S.C. § 6085(c)(1)(B)). "But in May of 2019, President Trump lifted the suspension, making Title III fully effective." *Id.* at 920. And it remains fully effective today.

### B.  Factual Background

#### i.  *North American Sugar's Stolen Property*

When Fidel Castro seized control of the Cuban government, North American Sugar was one of the largest sugar producers in the world.  The company's property included a large commercial shipping port known as Puerto Carupano, which is in the municipality of Puerto Padre, Cuba.  Puerto Carupano was and remains the only commercial shipping port in  Puerto Padre.

On July 20, 1960, the Cuban government confiscated Puerto Carupano from North American Sugar.  The Cuban government uses Puerto Carupano for its own commercial and non-commercial activities.  Indeed, on January 20, 1978, Fidel Castro made a public speech at Puerto Carupano, where he proclaimed that ports that were previously owned by "the capitalists" were now the "property of the people."  He reiterated that the ports had "ceased to be operated by private enterprise."

In October 1964, Congress enacted Title V of the International Claims Settlement Act, 22 U.S.C. §§ 1643–1643k,[2] to respond to the Castro regime's expropriation of property from U.S.

---

[2] *See also* Amendment to the International Claims Settlement Act of 1949, Pub. L. No. 88-666, 78 Stat. 1110 (1964).

nationals.  Title V established the Cuba Claims Program and pro-vided the U.S. Foreign Claims Settlement Commission ("FCSC") with authority to administer the program.  *Id.* §§ 1643a(2), 1643b, 1643f.  North American Sugar submitted a claim, and in 1969, the FCSC certified that North American Sugar suffered a loss of $97,373,414.72.  That amount is the second-highest amount certi-fied by the FCSC under the Cuba Claims Program.  Of note for the Helms-Burton Act, the FCSC's certification of a claim is "conclu-sive" as to ownership and presumptively correct as to value.  *See* 22 U.S.C. §§ 6082(a)(2), 6083(a)(1); *see also id.* § 1643*l*.

### ii.  The Alleged Trafficking

Defendant-Appellee Goldwind is a Chinese wind-energy company that contracted in 2013 with Energoimport, a Cuban pub-lic energy company.  Defendant-Appellee Goldwind International negotiated and signed the contract as Goldwind's "authorized rep-resentative."  Under the contract, Goldwind agreed to deliver wind-turbine units to Energoimport's new wind-farm project in Herradura, Cuba.  And, importantly for this case, the wind turbines would be delivered to and unloaded at Puerto Carupano—the port stolen from North American Sugar by the Cuban government.

But to deliver wind-turbines to Puerto Carupano, Goldwind needed help.  For one thing, Goldwind needed wind-turbine blades and required assistance from a manufacturing company that could provide the blades in China so Goldwind could ship complete wind-turbine units to Cuba.  Goldwind decided to buy the blades

from LM, a Danish subsidiary of GE, which is an American company.

LM's status as a subsidiary of an American company, however, raised a problem.  For decades, the United States has sanctioned and maintained a trade embargo with Cuba.  As part of the embargo, companies exporting goods to Cuba that contain U.S.-manufactured components generally must have two export licenses: a license from the Bureau of Industry and Security ("BIS") and a license from the Office of Foreign Assets Control ("OFAC").  *See* 15 C.F.R. § 746.2; 31 C.F.R. § 515.201.  As such, during negotiations of the blade-supply contract, LM notified Goldwind that Goldwind needed licenses from the U.S. government to ship LM's wind-turbine blades to Cuba.  Because it was a subsidiary of an American company, LM refused to sign the contract without assurance that Goldwind was willing to participate in securing the proper licenses.  Goldwind agreed, and the contract required LM to procure the necessary licensing for the shipment.  The contract further specified that once LM obtained the proper license, LM needed to "notify [Goldwind] immediately" and then "support [Goldwind] with the relevant documents in order for [Goldwind] to apply for import customs declaration."

To obtain the proper licensing for the shipment, LM sought the assistance of Defendant-Appellee DSV.  DSV believed that obtaining an OFAC license would be especially difficult because "the Department of Treasury," which issues OFAC licenses, "is not pro-business with Cuba and [it] could take a while to obtain such

23-10126                Opinion of the Court                9

license." However, under the Treasury Department's regulations, the Department authorizes the shipment of certain goods to Cuba without an OFAC license if the shipment is covered by a BIS license and is an export "*from* the United States." 31 C.F.R. § 515.533(a) (emphasis added). DSV and LM were confident that they could secure a BIS license for the Goldwind shipment because they believed that "the Department of Commerce," which issues BIS licenses, "is pro-business with Cuba."

But there was a catch. DSV and LM needed Goldwind's wind-turbine shipment to come "*from* the United States." 31 C.F.R. § 515.533(a) (emphasis added). So, DSV and LM hatched a plan. Under their reading of 31 C.F.R. § 515.533(a), LM and DSV determined that they could ship the wind turbines "from China to Cuba, with a layover in Miami" so that the turbines would come "from" the U.S.[3]

To accomplish the Goldwind shipment, DSV's Danish affiliate engaged BBC Chartering Carriers GmbH & Co. KG ("BBC Carriers"), a shipping and logistics company, that through its affiliates, Defendants-Appellees BBC USA and BBC Singapore, allegedly provided additional shipping logistics assistance. Most significantly, two of BBC Carrier's vessels—the *BBC Jade* and *BBC Moonstone*—were ultimately used to ship the wind turbines to Miami and then to Puerto Carupano, Cuba. The *BBC Jade* left China on

---

[3] We take no position on whether this reading of § 515.533 is correct as applied to the shipment at issue in this case. We merely recount DSV's and LM's reasoning to explain why the Defendants believed a stop in Miami was necessary.

November 15, 2018, and arrived in Miami on December 30, 2018. After clearing customs in Miami, the *BBC Jade* left for Cuba on December 31, 2018, and arrived at Puerto Carupano on January 6, 2019. Likewise, the *BBC Moonstone* left China on December 24, 2018, and arrived in Miami on January 30, 2019. Later that same day, the *BBC Moonstone* left for Cuba and arrived in Puerto Carupano on February 4, 2019.

As is evident by now, the scheme to ship wind turbines from China to Cuba, with a stop in Miami, involved many actors. Here, North American Sugar sues five actors in particular: Goldwind, Goldwind International, DSV, BBC Singapore, and BBC USA. North American Sugar's hook for personal jurisdiction over each of these Defendants is the stop of the *BBC Jade* and the *BBC Moonstone* in Miami. But after jurisdictional discovery, each of the Defendants submitted declarations claiming that they were not involved—or had limited involvement—in the Miami stops.

With respect to DSV, North American Sugar alleges that DSV committed Helms-Burton trafficking by routing the *BBC Jade* and the *BBC Moonstone* from China, through Miami, and then to Puerto Carupano. Also, North American Sugar alleges that DSV participated in procuring the requisite BIS licenses while the ships were docked in Miami. And importantly, North American Sugar alleges that Carol Scheid, a customs broker from DSV's Miami office, was involved in these activities while working in Miami. DSV responds with a declaration from Kenneth Witkowski, DSV's Director of Quality & Compliance. Witkowksi declares that DSV had

no role in planning or tracking the route of the *BBC Jade* and *BBC Moonstone* and that none of DSV's Florida offices were involved in the Goldwind shipments.

North American Sugar contests both of Witkowski's claims with several pieces of evidence, including DSV emails discussing the legal propriety of the Miami stops, twenty-two DSV emails about the Miami stops to Carol Scheid (DSV's Miami-based customs broker), including one sent to Scheid alone, and four DSV documents related to the Goldwind shipments that list DSV's Miami office as the source of the documents. Two of the documents are Importer Security Filing ("ISF") forms that DSV prepared for U.S. Customs in connection with the stops of the *BBC Jade* and the *BBC Moonstone* in Miami. Both ISF forms list the Miami office's address, telephone number, and fax number at the top of the documents. Also, DSV drafted two letters to Energoimport—Goldwind's customer in Cuba—that listed the address and phone number of DSV's Miami office at the top of the letters.

Regarding BBC Singapore, North American Sugar alleges that "BBC Singapore was responsible for facilitating the voyages of the two vessels," and most importantly, "BBC Singapore . . . corresponded and coordinated directly with port agents in Florida to facilitate the vessels' stopover in Miami, including arranging for customs clearance while in Florida." BBC Singapore responds with a declaration from Lars Schoennemann, the managing director of BBC Singapore. Schoennemann declares that BBC Carriers—a separate, German corporation—hired and directed the Miami port

agents.  Also, according to Schoennemann, "BBC Singapore does not own or operate any ships," including the *BBC Jade* and the *BBC Moonstone*.

But Schoennemann admits that "BBC Singapore's business is to act as [an] agent for BBC Carriers."  And, to counter Schoennemann's declaration, North American Sugar presents email correspondence between BBC Singapore and the Miami port agents suggesting that BBC Singapore performed a managerial role over the Miami port agents.  In a January 2019 email to the Miami port agents, Randall Sullivan—a Chartering Manager from BBC Singapore—thanked the Miami port agents for "getting my BBC Jade pushed through Miami" and he said "everything went fine for us and we're happy with the service that you guys provided to BBC." He also asked for "a brief rundown" of the port agent's activities related to the *BBC Jade* so that BBC Singapore could prepare a "lessons learned" document for the *BBC Moonstone*'s upcoming voyage.

Regarding BBC USA, North American Sugar alleges that BBC USA "directly participated in the months-long planning, scrutinization, and ultimately consummation of" the Miami stop.  In response, BBC USA submitts a declaration from its President, Per Petersen, disclaiming any role in the *BBC Jade* shipment and any role in the *BBC Moonstone*'s trip to Cuba.  According to Petersen, BBC USA "does not own or operate any ships," including the *BBC Jade* and the *BBC Moonstone*.  BBC USA also highlighted the Schoennemann declaration, which says that "BBC USA had no role in connection with the shipments to Cuba" because "as a matter of policy

established between BBC Carriers and BBC USA . . . BBC USA never becomes involved in any shipments to or from Cuba."

But North American Sugar responds with several emails suggesting that BBC USA was involved in the Goldwind shipment, notwithstanding its usual policy. For example, Randall Sullivan of BBC Singapore emailed Ed Anderson, BBC USA's general counsel, asking for "comprehensive guidance on what the requirements are . . . to move [the Goldwind] cargo into Cuba – without getting in trouble with uncle sam." The exhibit documents no email response from BBC USA. But a few months later, an operations manager at BBC Singapore sent an internal email regarding the Goldwind shipments, and she said, "pls note this info shall not be directly sen[t] to BBC Houston as we are calling Cuba. Kristina can you pls coordinate with Houston (via PHONE ONLY)." North American Sugar also highlights a second email with similar directions. And although BBC USA was directed to discuss the Goldwind shipments "via PHONE ONLY," there is an additional email suggesting that BBC USA was involved in reviewing the BIS licenses for the *BBC Jade* shipment. On November 6, 2018, BBC Singapore forwarded an email chain to Beverly Scott, a customs specialist at BBC USA. The email chain related to DSV's procurement of licensing for the Goldwind shipment on the *BBC Jade*. BBC Singapore asked Scott to review DSV's work and provide "any comments." Scott responded, "[e]verything looks good and correct to me."

Finally, North American Sugar alleges that Goldwind and Goldwind International participated in the trafficking scheme. But Goldwind and Goldwind International disclaim any connection with Florida, the United States, or the other defendants. Li Guoliang—Goldwind's Legal Director—and Zhu Hui—Goldwind International's Chief Financial Officer—submitted declarations stating that neither Goldwind Defendant is a party to any contract with DSV, BBC Singapore, or BBC USA; that neither Goldwind Defendant communicated with the U.S. office of any entity concerning the *BBC Jade* and *BBC Moonstone* shipments; and that neither Goldwind Defendant conducts business in Florida or the United States. On appeal, the Goldwind Defendants emphasized that LM—the blade supplier—hired DSV and planned the Miami stops with DSV to secure the requisite licenses.

In response, North American Sugar presents evidence that the entire scheme was created to enable the Goldwind Defendants to deliver wind turbines to Energoimport in Cuba. LM's blade-supply contract with Goldwind obligated LM to procure the necessary licensing so that *Goldwind* could complete its shipment. And, when Goldwind purchased the wind-turbine blades from LM, LM expressly conditioned its sale on Goldwind agreeing that the ships should stop in a U.S. port before proceeding to Puerto Carupano. The blade-supply contract also obligated LM to keep Goldwind notified of the licensing scheme, and North American Sugar presents emails between LM and the Goldwind Defendants proving that Goldwind reviewed and approved of the Miami stops. In one email, a Goldwind employee asked an LM employee whether "[i]n

view of the current international situation," there was a possibility that the U.S. government would "detain[]" the *BBC Jade*, "resulting in a delay . . . or even being unable to reach Cuba?"

Also, North American Sugar presents documents suggesting that the Goldwind Defendants were aware of and involved in the Miami stops. An email chain shows that DSV kept Goldwind informed of the *BBC Jade*'s progress toward Miami. And Goldwind submitted export-control declarations for the wind-turbine shipments. Next, the BIS license issued by the Department of Commerce lists "Goldwind" as the "Purchaser" in China and the "Approved End User" in Cuba of the LM blades. Finally, Goldwind sent the BIS license to Energoimport (Goldwind's customer in Cuba) so that Energoimport could review the licenses.

## C. Procedural History

On June 15, 2020, North American Sugar filed suit against the Defendants in the Southern District of Florida. The Defendants moved to dismiss North American Sugar's complaint for lack of personal jurisdiction, *see* Fed. R. Civ. P. 12(b)(2), and failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6). Thereafter, North American Sugar moved for jurisdictional discovery, which the district court granted.

After completion of jurisdictional discovery, North American Sugar filed its first amended complaint, which remains the operative pleading. The Defendants again moved to dismiss for lack of personal jurisdiction, *see* Fed. R. Civ. P. 12(b)(2), and, later, for failure to state a claim, Fed. R. Civ. P. 12(b)(6).

The district court referred the Defendants' 12(b)(2) motions to a magistrate judge, and the magistrate judge held a hearing on the Defendants' motions.  The magistrate judge recommended that the district court dismiss North American Sugar's amended complaint for lack of personal jurisdiction as to all five Defendants.  Overall, the magistrate judge emphasized that because North American Sugar's stolen port is in Cuba, "the Plaintiffs' claims hinge on . . . trafficking that occurred in Cuba."  Further, the magistrate judge found that none of the Defendants engaged in any activity in Florida related to the Goldwind shipments.

North American Sugar objected to the report and recommendation.  While its objection was pending, this Court published its opinion in *Del Valle*, 56 F.4th 1265.  North American Sugar filed a notice of supplemental authority, arguing that *Del Valle* rejects the idea that Helms-Burton "trafficking" occurs only "in Cuba"—a central premise of the report and recommendation.  The district court adopted the report and recommendation concluding that *De Valle* was inapplicable to this case.  North American Sugar appealed.

## II.    STANDARD OF REVIEW

"[T]he issue of whether personal jurisdiction is present is a question of law and subject to de novo review."  *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009).  And, because the district court resolved this case under a prima facie

standard, as discussed below, we review it's factual representations de novo.

Generally, "[a] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). But if "a defendant challenges personal jurisdiction in a Rule 12(b)(2) motion to dismiss," Federal Rule of Civil Procedure 12(i) affords the district court "discretion on how to proceed." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021). The district court has two options: (1) hold an evidentiary hearing before trial to make factual findings about personal jurisdiction or (2) decide the motion to dismiss "under a prima facie standard" without an evidentiary hearing. *Id.* at 1364–65; Fed. R. Civ. P. 12(i) ("If a party so moves, any defense listed in Rule 12(b)(1)–(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.").

If the district court holds an evidentiary hearing, then it should "impose the preponderance-of-the-evidence standard right away" and "'find the relevant jurisdictional facts'" "during the pretrial phase." *AcryliCon*, 985 F.3d at 1364 (quoting *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010)). Those factual findings are reviewed for clear error on appeal. *Id.* at 1363. But if the district court does not hold an evidentiary hearing, "the district court does not weigh evidence or make credibility

determinations." *Id.* at 1364–65.    Instead, it simply reviews "[w]hether the plaintiff satisfies the prima facie requirement," which "is a purely legal question" that is subject to de novo review on appeal. *Id.* at 1364; *Oldfield*, 558 F.3d at 1217.

To be sure, even if the district court does not hold an evidentiary hearing, the defendant challenging jurisdiction may submit "affidavit evidence in support of its position" at the pleading stage. *Mazer*, 556 F.3d at 1274.  And in that case, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).  But even then, if the district court does not hold an evidentiary hearing under Rule 12(i), the district court must construe all reasonable factual inferences in favor of the plaintiff to the extent that "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (quoting *Meier*, 288 F.3d at 1269).  If the court applies the prima facie standard instead of making factual findings at a Rule 12(i) hearing, "[a]fter trial, if the defendant still believes personal jurisdiction is lacking, it may invite the district court to revisit personal jurisdiction in light of the evidence produced at trial, at which time the court will impose a preponderance-of-the-evidence standard." *AcryliCon*, 985 F.3d at 1365.

Here, we review the district court's factual representations de novo because the district court decided this case under a prima facie standard and did not hold an evidentiary hearing under Rule

12(i). *See, e.g.*, *id.* at 1363–65.  To be sure, the district court author-ized jurisdictional discovery and referred the Defendants' 12(b)(2) motions to a magistrate judge who held a videoconference hearing on the Defendants' motions.  But the magistrate judge's hearing was not an evidentiary hearing.  And although the magistrate judge considered declarations and documentary evidence that the parties attached to their motions and responses, the parties did not call witnesses, and only presented legal arguments about their mo-tions.  The magistrate judge also limited the hearing to three hours because she scheduled another hearing later in the afternoon.  Alt-hough nothing is wrong with these procedures for a prima facie consideration of personal jurisdiction, this is not the kind of hearing that allows the district court to make factual findings before trial under Rule 12(i).[4]  Thus, we review the district court's factual rep-resentations de novo, construing "all reasonable inferences in favor of the plaintiff" to the extent that "the plaintiff's complaint and sup-porting evidence conflict with the defendant's affidavits." *Diamond Crystal*, 593 F.3d at 1257 (quoting *Meier*, 288 F.3d at 1269).

### III.    ANALYSIS

The district court's dismissal of North American Sugar's complaint turned on two incorrect assumptions.  First, the district court agreed with the magistrate judge's determination that the

---

[4] In their briefs, none of the Defendants argued that the magistrate judge or the district court held an evidentiary hearing under Rule 12(i).  Also, none of the Defendants took that position at oral argument, notwithstanding direct questions from the Court.

alleged Helms-Burton violations occurred only "in Cuba," notwithstanding the broad definition "traffics" under the Act, 22 U.S.C. §§ 6023(13)(A), 6082(a)(1)(A).  Second, the district court also weighed conflicting evidence to conclude—as a factual matter—that no Defendant engaged in Helms-Burton trafficking in Florida, even though the 12(b)(2) motions were resolved under a prima facie standard. But neither the magistrate judge nor the district court held an evidentiary hearing as is required when district courts weigh evidence to resolve factual disputes about personal jurisdiction before trial.  Because the district court (1) did not read "traffics" under Helms-Burton broadly enough, and (2) improperly credited Defendants' personal-jurisdiction evidence over Plaintiff's without an evidentiary hearing, we vacate and remand.

## A. The Helms-Burton Act is Broader than the District Court Conceived.

The initial error in this appeal stemmed from the magistrate judge's narrow reading of the Helms-Burton Act.  The magistrate judge's recommendation was largely premised on the notion  that North American Sugar's Helms-Burton claims "hinge" on "alleged trafficking that occurred *in Cuba*" while no trafficking occurred in Florida.  The district court agreed, explaining that "the record evidence simply does not establish that [the] Defendants engaged in any Florida-based activities that constituted a substantial aspect of the alleged trafficking."  However, neither the magistrate judge nor the district court addressed the broad definition under § 6023(13)(A) of the Act of the word "traffics."   While the

magistrate judge's report quoted parts of § 6023(13)(A), it never analyzed it, and the district court did not cite or discuss § 6023(13)(A).

The Helms-Burton Act imposes liability on anyone who "traffics" in property that "was confiscated by the Cuban Government on or after January 1, 1959" and was owned by someone who is now a "United States national." 22 U.S.C. § 6082(a)(1)(A). The Act defines "traffics" to encompass a broad array of activities; a defendant "traffics" when it "knowingly and intentionally":

> (i) sells . . . or . . . *uses*, or otherwise acquires or holds an interest in confiscated property,
>
> (ii) engages in a commercial activity *using* or *otherwise benefiting from* confiscated property, or
>
> (iii) *causes*, *directs*, *participates in*, or *profits from*, trafficking (as described in clause (i) or (ii)) *by another person*, or otherwise engages in trafficking (as described in clause (i) or (ii)) *through another person*, . . .

22 U.S.C. § 6023(13)(A) (emphasis added). Here, North American Sugar alleges that the Goldwind shipment constituted Helms-Burton trafficking because Goldwind "engage[d] in a commercial activity using or otherwise benefiting from confiscated property." 22 U.S.C. § 6023(13)(A)(ii). Specifically, the *BBC Jade* and the *BBC Moonstone* "use[d]" Puerto Carupano to dock in Cuba and unload Goldwind's wind-turbine shipment. 22 U.S.C. § 6023(13)(A)(i), (ii). Additionally, under Part (iii) of § 6023(13), other actors involved in the Goldwind shipments "traffic[ked]" Puerto Carupano from *outside* of Cuba by "caus[ing], direct[ing], participat[ing] in, or

profit[ing] from trafficking by another person" who "us[ed] or otherwise benefit[ed] from" Puerto Carupano. *Id.* § 6023(13)(A)(ii)–(iii). Also, because Part (ii) of § 6023(13) broadly provides that trafficking includes "commercial activity . . . benefiting from confiscated property," *id.* § 6023(13)(A)(ii), actors outside of Cuba "traffic[ked]" Puerto Carupano simply by engaging in commercial activity that in some way benefited from Puerto Carupano.

Our decision in *Del Valle* confirmed this broad reading of the Helms-Burton Act. In *Del Valle*, the plaintiffs were Florida citizens who sued "several entities that own and operate travel websites." 56 F.4th at 1271. The plaintiffs "were the living heirs to separate beach-front properties nationalized by the Cuban government after the 1959 revolution." *Id.* The travel websites "trafficked" the plaintiffs' properties by advertising the properties and enabling customers to book stays at the properties. *Id.* The district court dismissed the plaintiffs' complaint for lack of personal jurisdiction, explaining that the tort at the heart of the plaintiffs' Helms-Burton Act claims was "traffic[king] in . . . confiscated property, which occurred *in Cuba*." *Del Valle v. Trivago GmbH*, No. 19-22619-CIV, 2020 WL 2733729, at *3 (S.D. Fla. May 26, 2020) (emphasis added).

On appeal, we reversed, noting that the district court had personal jurisdiction under both Florida's long-arm statute and the Due Process Clause. *Del Valle*, 56 F.4th at 1272–77, 1279. *Del Valle* explained that because § 6023(13) of the Helms-Burton Act broadly defines "traffics," the defendants violated the Act in Florida, not just in Cuba. *Id.* at 1273. Specifically, under § 6023(13)(A)(ii), "a

23-10126                Opinion of the Court                23

person traffics in confiscated property when he or she knowingly and intentionally engages in a commercial activity using or otherwise benefiting from the confiscated property." *Del Valle*, 56 F.4th at 1273. And in *Del Valle*, "the plaintiffs alleged that the [travel websites] trafficked [in Florida] . . . by specifically targeting and 'selling' reservations at the Resorts to Florida residents through their websites." *Id.* (emphasis omitted). The travel websites "allegedly trafficked in the confiscated properties by profiting from web traffic generated by Florida residents' interest in the Resorts *and* from reservations made by Florida residents at the Resorts through their commercial websites—commercial activities using or otherwise benefiting from the confiscated properties." *Id.* at 1274 (emphasis original). Overall, because of the broad language of § 6023(13)(A), an actor can violate the Helms-Burton Act in Florida even though the confiscated property that the actor "traffics" is located in Cuba. *See Del Valle*, 56 F.4th at 1273–74. Thus, the district court erred by narrowly construing the alleged Helms-Burton violation as trafficking that occurred only in Cuba.

The district court's reading of the Helms-Burton Act and *Del Valle* led to an erroneous conclusion about the locations of the trafficking that North American Sugar alleges in this case. That, in turn, affected the district court's personal-jurisdiction analysis under the tortious-act prong and business-activity prong of Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(1), (1)(a)(2), and under the Due Process Clause. On remand, the district court should revisit both Florida's long-arm statute and the Due Process Clause in light of a correct reading of the Helms-Burton Act. *See Del Valle*, 56 F.4th

at 1272 (noting that under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court "undertakes a two-step analysis to determine whether there is personal jurisdiction over a nonresident defendant"—focusing first on "the forum state's long-arm statute" and then on "the Due Process Clause of the Fourteenth Amendment").[5]

## B. The Tortious-Act Prong of Florida's Long-Arm Statute

In light of our discussion above of the Helms-Burton Act, we find it necessary to address what constitutes Helms-Burton trafficking "within" Florida under the tortious-act prong of Florida's long-arm statute. *See* Fla. Stat. § 48.193(1)(a)(2).

Section 48.193(1)(a)(2) confers specific personal jurisdiction over non-resident defendants "who personally or through an agent" "[c]ommit[] a tortious act within" Florida and a cause of

---

[5] North American Sugar argued below that the court had personal jurisdiction over the Goldwind Defendants and BBC Singapore under Rule 4(k)(2). But it waived that argument on appeal. In North American Sugar's opening brief, it made a passing reference to its Rule 4(k)(2) argument in a footnote. If a party makes "only a passing reference to [an] argument in a footnote of [its] brief," the argument "is waived." *LaCroix v. Town of Fort Myers Beach, Fla.*, 38 F.4th 941, 947 n.1 (11th Cir. 2022). In North American Sugar's reply brief, it claims that it advanced arguments relevant to Rule 4(k)(2) in the main body of its opening brief. But in the page range that North American Sugar cites, there is no reference to "Rule 4(k)(2)"—in fact, there's no reference to Rule 4(k)(2) anywhere in the opening brief except the footnote. "Any issue that an appellant wants the Court to address should be specifically and clearly identified in the brief." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004). Otherwise, the argument "is deemed abandoned and its merits will not be addressed." *Id.*

action "aris[es] from" that tortious act. When interpreting and applying Florida's long-arm statute, *see* Fla. Stat. § 48.193(1)(a), we are bound by the decisions of the Florida Supreme Court. *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1166–67 (11th Cir. 2005). "We are also bound to adhere to the interpretations of Florida's long-arm statute offered by Florida's District Courts of Appeal absent some indication that the Florida Supreme Court would hold otherwise." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013).

Two important rules should inform the district court's analysis on remand. *First*, as we held in *Del Valle*, under section 48.193(1)(a)(2), a non-resident defendant "[c]ommit[s] a tortious act within" Florida simply by engaging in Helms-Burton trafficking in Florida so long as the trafficking gives rise to a cause of action. *See* 56 F.4th at 1274 ("It is the Florida residents' booking of accommodations at the Resorts through the websites—the material communicated 'into' Florida—that gives rise to the plaintiffs' trafficking claims under Title III and provides for specific personal jurisdiction under § 48.193(1)(a)(2)." (quoting *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1215 (Fla. 2010))).[6] Thus, for purposes of the tortious-

---

[6] Under Florida law, the violation of a statutory provision also constitutes a tort. *See Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 585 n.8 (Fla. 2000) (quoting *Prosser and Keeton on The Law of Torts* 2 (W. Page Keeton ed., 5th ed. 1984)) ("[b]roadly speaking, a tort is a civil wrong, other than a breach of contract, for which the court will provide a remedy in the form of an action for damages."); *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1224 n.5 (11th Cir. 2023) (quoting this passage from *Execu-Tech* when

act prong of Florida's long arm statute, the question is simply: what did the Defendants do—in Florida—to give rise to a cause of action by "traffic[king]" under the Helms-Burton Act?    22 U.S.C. §§ 6023(13)(A), 6082.

*Second*, although a non-resident can commit a tortious act in Florida through telephonic, electronic, or written communications into Florida, that possibility exists only in contexts where the plaintiff suffered an injury in Florida. *Horizon Aggressive Growth*, 421 F.3d at 1168 ("[J]urisdiction may be found in certain instances where an out-of-state defendant commits a tort that *produces an injury* in Florida. *For example*, allegations about an out-of-state defendant's 'telephonic, electronic, or written communications into Florida, are sufficient to trigger jurisdiction under the Long–Arm statute provided, however, that the cause of action arises from those communications." (emphasis added) (quoting *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002))).

The district court correctly articulated this principle, but this rule merits our attention because North American Sugar challenges it on appeal.  North American Sugar conceded at oral argument that it did not suffer an injury in Florida, but it argues that Florida law does not impose a Florida-injury requirement in cases

interpreting section 48.193(1)(a)); *France v. France*, 90 So. 3d 860, 862 (Fla. 5th DCA 2012) (treating a violation of the Florida Security of Communications Act as a tortious act); *Bacinello v. Admiral Marine Surveyors*, 338 So. 3d 326, 330 (Fla. 3d DCA 2022) (same).

involving telephonic, electronic, or written communications that are sent into Florida.

It is true that the standard articulated in *Wendt*—the seminal case on this question—does not explicitly impose a Florida-injury element. *Wendt*, 822 So. 2d at 1253, 1260 (holding that a non-resident can commit a tortious act "in Florida" through "telephonic, electronic, or written communications into Florida" provided that a "cause of action . . . arise[s] from the communications"). But *Wendt* articulated this standard in the context of a Florida plaintiff who suffered a Florida injury due to an out-of-state defendant's electronic communication into Florida, *Wendt*, 822 So. 2d at 1254, and *Wendt*'s test only applies in that context. *See id.* at 1253 n.2 (noting that the court did not "decide the *broader* issue of whether injury alone satisfies the requirement of section 48.193(1)(b) [now, section 48.193(1)(a)(2)]"); *Internet Solutions*, 39 So. 3d at 1206 n.6 (same). In *Horizon Aggressive Growth*, for example, we characterized *Wendt* as applying in contexts "where an out-of-state defendant commits a tort that produces an injury in Florida." 421 F.3d at 1168 (citing *Wendt*, 822 So. 2d at 1260); *see also Del Valle*, 56 F.4th at 1272–73 ("We have consistently held that, under Florida law, a nonresident defendant commits a tortious act in Florida by performing an act outside the state that causes injury within Florida." (citations omitted)).

Overall, North American Sugar's concession that it did not suffer a Florida injury makes *Wendt* inapplicable. So, to establish personal jurisdiction under Florida's long-arm statute, North

28                     Opinion of the Court                  23-10126

American Sugar must demonstrate that the Defendants, their agents, or their co-conspirators committed Helms-Burton trafficking while they were physically located in Florida.

### C.  Under the Prima Facie Standard, Some of The District Court's Factual Representations Were Incorrect

As explained above, even though Puerto Carupano is in Cuba, under the Helms-Burton Act, the Defendants could have "traffic[ked]" Puerto Carupano while they were physically outside of Cuba. *See* 22 U.S.C. § 6023(13)(A)(i)–(iii). North American Sugar presented evidence supporting a reasonable inference that at least one Defendant—DSV—engaged in trafficking activities in Florida. Specifically, North American Sugar provided evidence suggesting that DSV's Miami office was involved in planning and executing the stops of the *BBC Jade* and the *BBC Moonstone* in Miami.  North American Sugar presented twenty-two DSV emails about the Miami stops that DSV employees sent to Carol Scheid (DSV's Miami-based customs broker), including one sent to Scheid alone.  Most significantly, North American Sugar highlighted four DSV documents related to the Goldwind shipment that listed DSV's Miami office as the source of the documents.  Two of the documents are Importer Security Filing ("ISF") forms that were prepared for U.S. Customs in connection with the Miami stops.  Both ISF forms list the Miami office's address, telephone number, and fax number at the top of the documents.  DSV also drafted two letters to

Energoimport—Goldwind's customer in Cuba—that listed the address and phone number of DSV's Miami office at the top of the letters.

Notwithstanding this evidence, the district court held that none of the Defendants engaged in trafficking activities in Florida. Our precedents are clear: under a prima facie standard, if "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Meier*, 288 F.3d at 1269. "Whether the plaintiff satisfies the prima facie requirement is a purely legal question; the district court does not weigh evidence or make credibility determinations." *AcryliCon*, 985 F.3d at 1364–65. Although Rule 12(i) provides a district court with discretion to resolve factual disputes about personal jurisdiction before trial, the vehicle for that resolution is an evidentiary hearing. *Id.* at 1364. And as explained above, neither the magistrate judge nor the district court held an evidentiary hearing in this case. Thus, under the prima facie method and without an evidentiary hearing, to the extent that "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits," the district court was required to "construe all reasonable inferences in favor of the plaintiff." *Meier*, 288 F.3d at 1269.

The district court failed to do that here. DSV, for example, submitted a declaration from Kenneth Witkowski, DSV's Director of Quality & Compliance, who declared that none of DSV's Florida offices were involved in facilitating the Miami stops or the Goldwind shipments. Relying on the Witkowski declaration alone, the

district court concluded none of DSV's Florida offices participated in the alleged trafficking.  However, North American Sugar provided significant evidence—particularly the ISF forms and the letters to Energoimport—that listed the Miami office (with its address and telephone number) as the source of the documents.  True, in his declaration, Witkowski claimed that "DSV US filed the ISF forms . . . from its office in New Jersey" and that "[t]he ISF forms that were filed did not list DSV US's Miami, Florida address as that of the filing party."  But the ISF forms that Witkowksi describes are nowhere in the record, notwithstanding the fact that the Parties completed jurisdictional discovery.  Also, even if DSV did correct the ISF forms, the fact that some of the drafts contained the Miami office's address and phone number supports an inference that the Miami office at least participated in preparing the drafts.   North American Sugar's evidence created a reasonable inference that DSV's Miami office participated in the trafficking scheme.  Thus, by impermissibly crediting Defendants' evidence over North American Sugar's without a hearing, the district court did not properly credit North American Sugar's evidence under the prima facie standard.

Moreover, because North American Sugar alleges that all the Defendants participated in a conspiracy, Florida's long-arm statute could confer personal jurisdiction over the BBC Defendants and the Goldwind Defendants even if none of them personally acted in Florida. *See Mazer*, 556 F.3d at 1281–82 ("[Florida's] long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida

in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida."); *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000) (although Japanese defendant sold thermal paper "only in Japan" and maintained no office in Florida, it was subject to personal jurisdiction under Florida's long-arm statute because of alleged co-conspirators' violation of the Florida Deceptive and Unfair Trade Practices Act in Florida); *NHB Advisors, Inc. v. Czyzyk*, 95 So. 3d 444, 448 (Fla. Dist. Ct. App. 2012) ("[I]f a plaintiff has successfully alleged a cause of action for conspiracy . . ., and if the plaintiff has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of Florida through its long-arm statute."); *accord Amersham Enterprises, Inc. v. Hakim-Daccach*, 333 So. 3d 289, 296 (Fla. Dist. Ct. App. 2022); *Machtinger v. Inertial Airline Servs., Inc.*, 937 So. 2d 730, 734–36 (Fla. Dist. Ct. App. 2006); *Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. Dist. Ct. App. 1994).

The district court rejected a conspiracy theory of jurisdiction on the premise that North American Sugar "ha[d] not established that any Defendant committed a tortious act in Florida in furtherance of the alleged conspiracy to traffic the Property." But as we noted above, the district court incorrectly concluded, under the prima facie standard, that DSV did not commit Helms-Burton trafficking in Florida. On remand, the district court should first determine whether it has personal jurisdiction over DSV or any other Defendant for Helms-Burton trafficking in Florida. If it does, then

the district court should also consider whether it has personal jurisdiction over the other Defendants under the conspiracy theory of personal jurisdiction.

## IV.    CONCLUSION

For the above reasons, we vacate the district court's order adopting the magistrate judge's recommendation, and we remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**